597 So.2d 601 (1992)
Mary Monica Vial, Wife of Robert William BENSON
v.
Robert William BENSON.
No. 91-CA-914.
Court of Appeal of Louisiana, Fifth Circuit.
March 31, 1992.
Rehearing Denied April 16, 1992.
Writ Granted with Order; Stay Order Granted April 13, 1992.
Stay Order Vacated; Writ Denied June 19, 1992.
*602 S. Guy Delaup, Gerald S. Stewart, Metairie, for plaintiff/appellant.
A.D. Freeman, Frank P. Tranchina, New Orleans, for defendant/appellee.
Before GAUDIN, GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
This is an appeal by the mother of an award of custody of two minor sons to the father. We reverse.
Dr. Robert William Benson and Dr. Monica Vial were married on June 15, 1974 in St. Charles Parish. Two sons, Robbie and Chris, were born of the marriage. The couple established a matrimonial domicile in Jefferson Parish in August, 1975. Pursuant to a petition for separation filed by the mother in Jefferson Parish, a judgment granting the mother custody of the two *603 children was rendered on February 11, 1982.
Subsequently, a petition for divorce was filed. On April 27, 1983, after a trial on the merits, the trial court rendered a judgment of divorce and awarded permanent custody, care and control of the children to the mother with reasonable visitation rights to the father.
On January 25, 1984 the father filed a rule to establish a joint custody implementation plan. The parties embarked on a bitter custody battle which was resolved by a consent judgment rendered on June 7, 1984. That judgment dismissed the father's rule for joint custody and continued custody with the mother in accordance with the earlier divorce decree. The consent judgment outlined extensive, explicit visitation rights for the father and psychological treatment for both parties, the two children and Robert's new wife, Donna. Dr. Edward Shwery was appointed by the court to conduct the psychological evaluations.[1]
The consent judgment notwithstanding, the parents continued hostilities and each filed several motions involving issues of visitation and psychological evaluations, as well as rules for contempt.
The father, who remarried shortly after the divorce, now had three sons born of the second marriage and a step-son, the issue of Donna's first marriage. The father moved his family to Ponchatoula into a residence he refers to as the "Greenhouse."
At some point in 1990 the mother became romantically involved with and, subsequently married her distant cousin, Harry Vial, whom she introduced to her children as "Sam." She moved back to her home in St. Charles Parish.
On June 27, 1990 the father filed a rule to modify custody which was amended on August 16, 1990. On September 21, 1990, after reviewing names submitted by both parties, the court appointed Dr. Richard Dalton to conduct evaluations for the purpose of determination of custody in connection with the father's rule to modify custody.
While the rule was pending the father filed two petitions alleging that the mother physically abused the children. The petitions were supported by an affidavit from Dr. Roger Rholdon, a pediatrician and personal friend of the father. The mother countered the allegations with letters from Dr. Edward Shwery, a psychologist who had treated both Chris and his brother Robbie for seven years and Dr. Gerard A. Ballanco, the pediatrician who had been the children's regular pediatrician since their infancy. Both experts discounted the allegations that Monica Vial had physically abused her children. After an investigation, the child protection authorities dismissed the allegations as unfounded.
The rule for custody modification began in January, 1991 but was continued and ultimately completed in July, 1991. The trial lasted for several days and there is extensive testimony from various experts, as well as the parties and their children. On July 31, 1991 the trial court rendered a judgment awarding joint custody with primary physical custody of the minor children to the father and dismissing the rule for contempt filed on behalf of the mother.
On August 8, 1991 the mother filed an application for writs in this court alleging that the trial court erred in refusing to admit into evidence certain audio tapes of telephone conversations between the father and the minor children. This court granted the writ on September 4, 1991 and ordered the trial court to listen to three of the tapes and to decide whether the evidence justified a grant of a new trial and a rendition of a judgment in the mother's favor. The trial court complied with that order and held that the evidence did not justify the grant of a new trial. The mother, Monica Vial Benson, appeals the judgment of the trial court which awards joint custody of the minor children to both parents with primary physical custody to Robert Benson, and dismisses the rule for contempt against Robert Benson.
*604 CUSTODY
The trial court, in vacating the mother's long-standing physical custody award of these two young men ages 12 and 14, and awarding primary physical custody to the father constitutes a significant change in the former custody order. There must be a showing of a change in circumstances materially affecting the welfare of the child before the court may consider making a significant change in the custody order. Bergeron v. Bergeron, 492 So.2d 1193, 1194 (La.1986). As the court explained:
The child has at stake an interest of transcending value in a custody modification suithis best interest and welfare which may be irreparably damaged not only by a mistaken change in custody but also by the effects of an attempted or threatened change of custody on grounds that are less than imperative. The consequences to the mental and emotional well being and future development of the child from an erroneous judgment, unjustified litigation, threat of litigation, or continued interparental conflict are usually more serious than similar consequences in an ordinary civil case. On the other hand, we are convinced that in a narrow class of cases a modification of custody may be in the child's best interest even though the moving party is unable to show that the present custody is deleterious to the child. However, in order to protect children from the detrimental effects of too liberal standards in custody change cases, the burden of proof should be heavy and the showing of overall or net benefit to the child must be clear. To accommodate these interests, the burden of proof rule should be restated as follows: When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. (Citations omitted.)
Bergeron v. Bergeron, supra at 1200.
The father argues that the heavy burden of Bergeron is not applicable in this case since the award of custody to the mother was by consent decree. We disagree. The consent decree of June 7, 1984 merely dismisses the father's rule to change custody and continues custody with the mother as decided by the earlier considered decree of divorce. Thus, the burden of proof set out in Bergeron, supra, must be met by the father, as the mover. As stated above, Robert Benson has the heavy burden to prove that the continuation of custody with Monica Benson is so deleterious to the children as to justify a modification of the custody decree or he must prove, by clear and convincing evidence, that the harm likely to be caused by the change of environment is substantially outweighed by the advantages to the children. Bergeron, supra.
As previously stated the parties were divorced in 1983. These unfortunate children have been subjected to almost constant fallout of acrimonious litigation since that time. Such litigation continues in the trial court as evidenced by the allegations made in the father's motion, filed in this court, to stay appellate proceedings.[2]
In support of his rule to modify custody the father offered the testimony of Dr. James Denney, a psychiatrist who evaluated Dr. Robert Benson in November, 1990 at Dr. Benson's request. Dr. Denney testified that he saw Robert Benson on three occasions, did a clinical interview, a mental status examination and administered several tests with the aid of an assistant. Dr. Denney also testified that he reviewed the data of other experts in making his determination. His conclusion was that Robert Benson fell within the normal range with *605 no psychotic features, severe neurosis or characterological problems.
The court next heard testimony from Dr. Richard Dalton, an expert in the fields of child and adult psychiatry who was court appointed to evaluate and treat the parties and their children in a previous judgment. Dr. Dalton testified in January, 1991, at the start of the hearings in this matter, that he recommended the children not be interviewed prior to receiving therapy, along with the parents. The hearing was continued and Dr. Jan Rieveschl was selected as a therapist for the children, by consent judgment of the parties.[3]
Dr. Dalton testified that he interviewed Robbie and Chris, Monica Benson, Robert Benson and Donna Benson. Dr. Dalton also considered what he described as a "plethora" of source materials, including several psychiatric work-ups on Dr. Robert Benson, two psychological work-ups on Dr. Monica Benson, two or three on each of the boys and audio tapes of telephone conversations between Dr. Robert Benson and each of the boys. Additionally, Dr. Dalton considered an audio tape entitled "Love Conquers All," a motivational tape made by Dr. Robert Benson for his sons.
When questioned regarding his conclusions as to the ability of Monica and Robert to parent, Dr. Dalton testified that neither Monica nor Robert has anything in their character which would prevent them from being loving parents.
Dr. Dalton described Dr. Robert Benson as an individual who has sociopathic tendencies and explained that such a person will, when under pressure, lose a certain empathy reference and use unfair means to achieve an end which they believe to be justified. Dr. Dalton testified that Dr. Robert Benson is an honorable man, but one who will fight "in an ugly, unfair way."
On cross-examination Dr. Dalton gave specific examples of Dr. Benson's unfair means. When Dr. Monica Benson became romantically involved with Harry Vial, whom she subsequently married, Robbie and Chris became anxious because of a normal concern about the possibility of displacement when this new man entered their mother's life. Dr. Robert Benson, instead of reassuring Robbie and Chris about their mother's impending remarriage, used the circumstances to try to obtain custody. Further, Dr. Robert Benson made two allegations of physical abuse of Chris by Monica. Allegations which resulted from an overreaction on Monica's part which were used by Robert in an attempt to seize custody. In summarizing Robert's behavior in these custody proceedings, Dr. Dalton stated that Robert was insincere and could not be trusted.
Dr. Dalton describes Robert as a rigid person with black and white views of the world in which he takes the high moral ground. Robert describes his home as "a Christian home, a loving home, a home where people don't curse and don't drink." Robert describes Monica's home as "one where there's a lot of drinking and cursing." Dr. Dalton stated that he personally didn't believe that to be the case and pointed out that, when asked, Robbie stated, "in my Father's house people do not curse and do not drink." Dr. Dalton testified that he believed that to be a strange thing for a thirteen-year-old boy to say and probably was something he heard.
When questioned on his ultimate conclusion on the custody issue, Dr. Dalton stated that it would be less detrimental for the boys to live with their father at this time. He explained that it is his opinion that boys should, at some point, live with their father. He stated that, ideally, this should be an amicable, joint decision between the parents. In this case, however, that was not likely to happen and, although he finds no reason to take the children away from their mother, the boys should now live with their father. He testified that he thought *606 it would benefit both boys, Robbie especially, to see Robert Benson's faults.
Dr. Edward Shwery testified that he had treated both Robbie and Chris from 1984 until 1990 by court appointment. He testified that Monica cooperated and made some effort to reduce the conflict, but Robert Benson refused to cooperate. He testified that he did not find anything in Monica's personality which would be suggestive of abuse or neglect of her children. He stated that he could not comment on Robert's ability to parent but he felt that Robert's refusal to cooperate in therapy was destructive to the children's progress.
Dr. Max Sugar, a psychiatrist, testified on behalf of Monica Benson. He stated that he did not interview any of the parties to this matter, but did review the documentation, including various psychologicals and the audio tapes previously mentioned.
Dr. Sugar testified that a review of Dr. Dalton's records revealed that his recommendation that the children should live with their father is inconsistent with his initial report. In that report, Dr. Dalton observed that Robert Benson clearly fit a derogatory psychological evaluation written previously by Dr. Moan[4] and the children should remain with their mother. Dr. Dalton also wrote that the children may make a decision to live with their father, but that decision would be a result of emotional abuse and manipulation by their father.
Dr. Sugar stated his opinion that the children are not capable of making the decision of where they should live since they are not capable of understanding the emotional abuse.
The court also heard testimony from Robert Benson, who explained his actions in making the child abuse reports against Monica. He stated that he sought the change in custody because of the difference in lifestyles between himself and Monica. He characterizes himself as a religious, family oriented man who spends a lot of time with his children. He characterizes Monica and her husband, Harry, as abusive individuals who use foul language.
In her testimony, Monica Benson characterizes Robert as a manipulative man who has continuously undermined her authority with the children and attempted to alienate their affections.
The court interviewed both Robbie and Chris in chambers and their testimony is contained in the record. Both boys expressed a desire to live with their father.
In reasons for judgment the trial court stated some of its findings as follows:
It has been the Court's observation during this long trial that both parents love their children. Neither parent is a bad parent nor means to be one. However, it is apparent that both have made some serious mistakes in their raising the children.
Most notably among the mistakes by the mother are the facts that these boys are not allowed any privacy in their dealing with their father or their own personal things.
Dr. Robert Benson, on the other hand, has undermined the boys' relationship with their mother, most notably by his filing child abuse charges against her.
The court expressed a reliance on Dr. Dalton's recommendation in awarding custody to the father. In that regard the trial court stated:
Dr. Dalton indicated that at this point in time the boys are as "conflict free" as possible. Dr. Dalton believed these parents to be in a tie, psychologically, concerning the raising of their sons and further that there is nothing in either's characters which negates their each being loving parents.
Dr. Dalton felt that it was most important that Robbie be allowed to be with his father so that he could see his father as he is and learn that he is not perfect. He would be unable to do this while living with his mother. He feels sure that the boys will come to blame their *607 mother if not allowed to live with their father.
While we share with the trial judge a deep concern for the well-being of two young men who are forced to accept such intense conflict between their parents on a daily basis, we do find the award of joint custody with the father as primary custodial parent in error. The father has not met his burden of proof as previously discussed.
Further, although there is a rebuttable presumption that joint custody is in the best interest of the child, a requisite element in any joint custody arrangement is that the spouses be able to set their differences aside and cooperate to carry out a joint custody plan. See Turner v. Turner, 455 So.2d 1374 (La.1984); Murrary v. Murrary, 521 So.2d 754 (La.App. 2nd Cir.1988). Where the testimony of the parties suggests that sufficient animosity and rancor exists between the parents such that they are unable to work together to the extent required in a joint custody arrangement, sole custody is mandated. Murrary v. Murrary, supra; Preau v. Preau, 499 So.2d 1270 (La.App. 4th Cir. 1986). In briefs to this court both parties concede that joint custody is unworkable in this matter. We agree.
For the foregoing reasons we reverse that portion of the judgment which awards joint custody and signifies the father as the primary custodial parent.
CONTEMPT
The mother filed a rule for contempt against the father on July 13, 1990 asserting that Robert Benson failed to abide by the consent judgment rendered on June 7, 1984 for the following reasons;
(1) The defendant, Robert W. Benson, failed and refused to allow the plaintiff, a weekend visitation with the minor children between the two two-week periods of summer visitation awarded to the defendant.
(2) The defendant, Robert W. Benson, had the minor children evaluated by two physicians, namely, Douglas Pool, M.D., and Camilla Cowardin, M.D., without discussing or informing the plaintiff of such actions, all in contravention of the Consent Judgment signed on June 7, 1984.
(3) The defendant, Robert W. Benson, has continuously attempted to alienate the minor children's affections for their mother which is in direct violation of the technical wording of the Consent Judgment signed on June 7, 1984, as well as with its spirit.
(4) The defendant, Robert W. Benson, has continuously attempted to undermine the authority of Monica Vial Benson over her minor children, which has caused considerable conflict in the lives of the minor children, requiring psychological evaluation.
C.C.P. art. 224(2) defines constructive contempt as "Wilful disobedience of any lawful judgment, order, mandate, writ or process of the court."
The court rendered a separate judgment with reasons in the rule for contempt. It is apparent from that judgment that, while the court found evidence of some actions which were inconsistent with the consent judgment, these actions did not constitute wilful disobedience. We do not find manifest error in that judgment of the trial court.
Another issue raised by appellant is the correctness of the visitation provisions in the judgment. Because we have reversed the award of custody, we also vacate that portion of the judgment which relates to the visitation rights of the mother without comment on the appropriateness of the visitation.
For the foregoing reasons the judgment is reversed in so far as it awards joint custody with primary custodial custody to Robert Benson. The judgment is vacated as to the provisions for visitation to Monica Benson. In all other respects the judgment is affirmed. The matter is remanded to the trial court for further proceedings not inconsistent with this opinion. Costs are assessed to appellee.
REVERSED IN PART, VACATED IN PART, AFFIRMED IN PART AND REMANDED.
CANNELLA, J., concurs.
*608 CANNELLA, Judge, concurring.
I concur in the majority opinion that custody of the children should remain with the mother.
However, I do not subscribe to the majority position that the "heavy burden" of proof is applicable, as set forth in the case of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). Bergeron requires a prior "considered decree" and not a consent judgment, which we have here.
There are four judgments in the record prior to the instant one. The judgments of 6/7/84 and 4/28/86 were by consent and the judgment of 2/11/82 was by default.
Concerning the fourth judgment of custody dated 4/27/83, Mrs. Benson filed a divorce petition and requested custody in paragraph VIII. A few days later, on 4/27/83, petitioner came to court with a witness, her attorney and the attorney for Mr. Benson. The attorney for Mr. Benson filed an Answer and a Motion to Set for Trial. The answer admitted all of the paragraphs of the petition of Mrs. Benson, except the one which dealt with alimony. Trial was conducted. Mr. Benson did not testify, call any witnesses or introduce any evidence. In my view, the judgment granted on 4/27/83 was not a "considered decree" as envisioned in Bergeron, supra. It was a judgment rendered in the nature of a default. A "considered decree" requires review and determination by a court and not agreement by the parties and order by the court. Cucchiara v. Cucchiara, 543 So.2d 638 (La.App. 1st Cir.1989); Bridgers v. Bridgers, 509 So.2d 793 (La.App. 1st Cir.1987); Dungan v. Dungan, 499 So.2d 149 (La.App. 2nd Cir.1986); Deese v. Deese, 387 So.2d 671 (La.App. 3rd Cir.1980); Johnson v. Johnson, 381 So.2d 1317 (La.App. 4th Cir.1980).
Where no "considered decree" of custody has been rendered, the party requesting a change in custody must prove two things, there has been a change in circumstances and the change in custody is in the best interests of the children. Bergeron, supra; Turner v. Turner, 455 So.2d 1374 (La. 1984); Johnston v. McCullough, 410 So.2d 1105 (La.1982); Cucchiara v. Cucchiara, supra.
Appellee contends that the relationship and marriage of Mrs. Benson to Mr. Vial is the change in circumstances. I agree. The best interests of the children must next be determined. I agree with all of the findings in the majority opinion regarding the best interests of the children. In addition, Mrs. Benson has had sole custody, since the separation, for the past 9 years. Stability of environment also supports Mrs. Benson. Johnston v. McCullough, supra. I agree with the majority that the best interests of the children mandate that custody should remain with Mrs. Benson. The judgment of the trial judge, therefore, was manifestly erroneous, and should be reversed.
Accordingly, I concur.
NOTES
[1] The father did not cooperate with Dr. Shwery. However, the two children remained patients of Dr. Shwery until Dr. Dalton was appointed in 1990.
[2] That motion has been denied since this court can consider nothing beyond the judgment from which an appeal has been taken.
[3] Dr. Rieveschl communicated with the court by letter dated May 1, 1991 that the two boys, Robbie and Chris, along with their parents, "participated intensively in a combined effort to help these two boys surmount their considerable turmoil owing to the prolonged dispute between their parents." Dr. Rieveschl indicated that the boys were as psychologically prepared as realistically possible to continue the custody litigation.
[4] Dr. Charles Moan did a psychological evaluation of Dr. Robert Benson in 1981. His report was used as a source material by the other experts in this matter.